On June 1, 1979, Plaintiff/Appellee Courtaulds North America, Inc., petitioned Defendant/Appellant Ralph P. Eagerton, Jr., as Commissioner of the State Department of Revenue, for a refund of sales and use taxes paid by Courtaulds on fuel oil purchases for the period May 17, 1976, through April 29, 1979.[1] The refund was requested because the taxes were paid on fuel oil allegedly used primarily as an integral part of pollution control devices.
Following the Department of Revenue's denial of its petition, Courtaulds sought a writ of mandamus from the circuit court, seeking to compel a refund of $180,000, with interest. A joint stipulation of facts was entered into by the parties, including the agreement that additional sales and use tax liability for purchases of fuel oil between April 30, 1979, and October or November of 1980 would be governed by the outcome of the instant proceedings. The stipulation contained no agreement respecting any allocation as between the two types of fuel (fuel oil and natural gas).
By letter dated August 10, 1981, the trial judge solicited assistance from counsel for both parties in drafting an order that would grant a portion of the refund to Courtaulds, premised upon an allocation of the two types of fuel used to generate steam in Courtaulds' boilers. Counsel for Eagerton notified the court that he declined to participate in the formulation of the proposed order as suggested, as the data required *Page 106 
were peculiarly within the knowledge and expertise of Courtaulds. Courtaulds agreed to assist the court, and submitted calculations along with two proposed orders for consideration. Thereafter, on September 11, 1981, the trial court conducted an evidentiary hearing, seeking clarification, as well as commentary from both parties, concerning the materials submitted by Courtaulds. Relying on § 6-8-103
(allowing a party to supply an omission in testimony),[2]
Eagerton contested the propriety of these proceedings, proffering both an oral and a written motion to exclude any "additional evidence" submitted at this hearing. The trial court declined to rule on either motion.
On September 23, 1981, the trial court entered a final judgment requiring Eagerton, as Commissioner of the Department of Revenue, to refund to Courtaulds sales and use taxes of $80,366.11, plus interest. The Commissioner appeals.
We affirm.
 FACTS
Courtaulds North America, Inc., is an Alabama corporation engaged in the production of rayon staple fiber at its plant in Le Moyne, Mobile County, Alabama. Pursuant to state and federal directives, Courtaulds installed as part of its pollution control facilities acid recovery and carbon disulfide removal systems, both of which require boilers to produce steam necessary for their operation.
For purposes of safety and economic reliability, all boilers at the Courtaulds plant are housed in a central unit, generating steam into a common pipeline, serving the entire facility. All boilers are capable of using either fuel oil or natural gas. Two boilers, designated as No. 7 and No. 8, were purchased to supply the required steam for the new pollution devices. Courtaulds paid no taxes on this purchase.
During the relevant period, May 17, 1976, through April 29, 1979, there were approximately nine boilers generating steam at the plant. All boilers were fired interchangeably with either natural gas or fuel oil. Boilers No. 7 and 8 have a steam generating capacity of 70,000 lbs./hour each for a total of 140,000 lbs./hour, while the total capacity of the remaining boilers is 250,000 lbs./hour. During the relevant period, boilers No. 7 and 8 consumed 8,757,411 gallons of fuel oil.
As a result of the installation of boilers No. 7 and 8, and the pollution control devices, additional fuel oil was purchased by Courtaulds. Natural gas was the preferred energy source, but depreciated allocations necessitated the purchase of fuel oil.[3] Some natural gas was still used, however, to fuel the boilers.
Pursuant to an audit of the period in question, Courtaulds was informed by a Department of Revenue field representative that establishment of a workable formula, determining the amount of fuel oil (as opposed to natural gas) used exclusively in the pollution control devices, might result in a favorable determination by the department regarding an exemption of sales and use taxes for Courtaulds on the purchases of such fuel oil. Although the acid recovery unit was equipped with flow meters to measure the amount of steam (lbs./hour) consumed, the carbon disulfide system lacked sufficient monitoring instruments. As a result, the amount of steam was calculated, using scientific factors or "constants."
Frank Hawkins, Courtaulds' chief design engineer, testified at trial as to the calculations used in support of Courtaulds' claim to an exemption. William Chapman, assistant *Page 107 
treasurer and assistant secretary for Courtaulds, submitted testimony that of the 16,260,333 gallons of fuel oil consumed during the relevant period, 14,982,724 gallons (92%) wasclaimed by Courtaulds to have been used primarily by its pollution control devices. The total cost of the fuel oil so used was $4,399,228 and the total tax computed thereon was $175,969.[4]
At the supplemental hearing on September 11, 1981, Courtaulds submitted, over Eagerton's objections, Plaintiff's Exhibit No. 7, containing calculations based on evidence already in the record, with the exception of Column 2, indicating the total amount of steam generated.[5]
 SALES AND USE TAX EXEMPTIONS
Courtaulds' position on appeal is that a portion of the fuel oil used during the relevant period to fire its boilers should be exempt from "sales" tax under Ala. Code 1975, § 40-23-4-(16), and from "use" tax pursuant to Ala. Code 1975, § 40-23-62 (18), because a portion of the total steam produced from its boilers was used to operate its pollution control facilities. The Department of Revenue, through Eagerton, disagrees, and submits that the fuel oil purchases do not fall within the specified exemptions of § 40-23-4 (sales tax) and § 40-23-62 (use tax):
"§ 40-23-4. Exemptions.
 "There are exempted from the provision of this division and from the computation of the amount of the tax levied, assessed or payable under this division the following:
". . .
 "(16) The gross proceeds from the sale of all devices or facilities, and all identifiable components thereof or materials for use therein, acquired primarily for the control, reduction or elimination of air or water pollution and the gross proceeds from the sale of all identifiable components of or materials used or intended for use in structures built primarily for the control, reduction or elimination of air and water pollution."
"§ 40-23-62. Exemptions.
 "The storage, use or other consumption in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this article:
". . .
 "(18) The storage, use or consumption of all devices or facilities, and all identifiable components thereof or materials for use therein, used or placed in operation primarily for the control, reduction or elimination of air or water pollution, and the storage, use or consumption of all identifiable components of or materials used or intended for use in structures built primarily for the control, reduction or elimination of air or water pollution."
Close analysis of §§ 40-23-4 (16) and 40-23-62 (18) evidences the qualifications for the stated exemptions. First, it must be a device or facility acquired primarily for pollution control purposes. Or second, it must be an identifiable component of a device or facility acquired primarily for pollution control purposes. Or third, it must be a material for use in a device or facility acquired primarily for pollution control purposes.
Code 1975, § 11-54-88 (c)(2), defines "pollution control facility" as follows:
 "Any land, building, structure, machinery or equipment having to do with or designed for or the end purpose of which is the control, reduction, abatement or prevention of air, noise, water or general environmental pollution, including, but not limited to, any air pollution control facility, noise abatement or reduction facility, *Page 108 
water management facility, water purification facility, waste water collecting system, waste water treatment works or solid waste disposal facility."
Inherent in the trial court's judgment for Courtaulds was a determination that boilers No. 7 and 8 were "devices" or "facilities" acquired primarily for pollution control. These two boilers were purchased specifically to meet the additional steam requirements caused by installation of the pollution facilities. Eagerton argues that these two boilers operated in a manner similar to all the others at the Courtaulds plant, and because all steam generated was channeled into a central line for distribution, it cannot be said that boilers No. 7 and 8 were "uniquely" associated with pollution control. Despite the correctness of the basic premise of such assertions, the trial judge, supported by competent scientific data, found to the contrary.
It is the policy of this Court to presume correct the findings of the trial court based upon competent evidence, when the evidence is presented ore tenus. Findings of fact will not be disturbed on appeal if supported by the evidence or any reasonable inference therefrom, unless they are plainly and palpably erroneous. First Alabama Bank of Montgomery, N.A. v.Coker, 408 So.2d 510 (Ala. 1982); Hopper v. Curry, 408 So.2d 83
(Ala. 1981).
While certain historic, objective facts were submitted by stipulation, the evidence bearing upon the crucial issues was presented ore tenus. Moreover, our independent review of the entire record compels us to a conclusion totally consistent with that of the trial judge.
We are unable to adopt the assertion of the commissioner that the fuel oil consumed by boilers No. 7 and 8 was nothing more than an "aid" to their function. Rather, we agree with the trial court's determination that the fuel oil was a "material" for use in a device or facility acquired primarily for pollution control purposes.
 THE TRIAL COURT'S EVIDENTIARY HEARING
Eagerton contends that by accepting "additional evidence" from Courtaulds, subsequent to the close of the parties' argument at trial, the trial court "reopened" the case in violation of Ala. Code 1975, § 6-8-103 (supra, at footnote 2). We disagree.
The trial judge requested assistance from both parties in drafting an order requiring numerous mathematical computations. Counsel for Eagerton declined to so participate, while Courtaulds submitted such data. Thereafter, the trial judge held a hearing for the purpose of analyzing and clarifying the matter submitted by Courtaulds. Both parties were present and each was afforded full opportunity to comment on, or seek to add to or subtract from, what had been presented to the court. Eagerton did neither, but simply objected to the propriety of the proceeding as a whole.
We fail to view this additional hearing as one that "reopened" the case. It is not uncommon in cases involving experts, and especially also involving mathematical calculations, for the trial court to seek assistance from all parties in moving toward a conclusion of the controversy. Nothing more was done in this instance. To hold, as the Commissioner suggests, that the court erred — in soliciting commentary from those more at home in a mathematical environment — would effectively restrict the permissible range of judicial discretion and seriously retard legitimate efforts to fully and fairly adjudicate a controversy.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.
[1] This refund procedure is authorized by Code 1975, § 40-1-34.
[2] § 6-8-103 states:
"The court may, at its discretion, at any time before theconclusion of the argument, when it appears to be necessary to the due administration of justice, allow a party to supply an omission in the testimony on such terms and under such limitations as the court may prescribe.
(Code 1907, § 5351; Code 1923, § 9490; Code 1940, T. 7, § 252.)" (Emphasis added.)
[3] No sales or use tax is levied on the purchase or use of natural gas. It is taxable through a utility tax. However, there is no exemption from the utility tax for natural gas for pollution control devices.
[4] These calculations were admitted into evidence as Plaintiff's Exhibit No. 1, with no objection by the Department of Revenue.
[5] This resulted in a finding that 42.2% of the total steam generated during the relevant period was used for pollution control and that 6,861,860 gallons of fuel oil was exempt from sales and use tax. Additionally, the trial court found the fuel oil to have been purchased at an average price of 29.28 cents per gallon, and with the application of a 4% tax rate, determined the total refund due Courtaulds to be $80,366.11. *Page 109